# EXHIBIT A

Case 1:25-cv-10674-GHW    Document 1-1    Filed 12/23/25    Page 2 of 35

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

RICHARD FOSTER,

                     *Plaintiff,*

            v.

WPP, PLC and GROUPM WORLDWIDE LLC
D/B/A WPP MEDIA,

                     *Defendants.*

Index No.:
Date Purchased: November 11, 2025

**SUMMONS**
Plaintiff Designates New York
County as the Place of Trial

**TO THE ABOVE-NAMED DEFENDANTS**:

       You are hereby summoned to answer the complaint in this action and to serve a copy of

your answer, or, if the complaint is not served with this summons, to serve a notice of appearance,

on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of

service (or within 30 days after the service is complete if this summons is not personally delivered

to you within the State of New York); and in case of your failure to appear or answer, judgment

will be taken against you by default for the relief demanded in the complaint.

Dated: November 11, 2025
       New York, New York

                             Respectfully submitted,

                             */s/ William A. Brewer III*

                             **BREWER, ATTORNEYS & COUNSELORS**
                             William A. Brewer III
                             William A. Brewer IV
                             750 Lexington Avenue, 14th Floor
                             New York, New York 10022
                             Telephone: 212.527.3024
                             wab@brewerattorneys.com
                             wbb@brewerattorneys.com

                             **ATTORNEYS FOR PLAINTIFF RICHARD FOSTER**

Case 1:25-cv-10674-GHW   Document 1-1   Filed 12/23/25   Page 3 of 35

TO:

**WPP, PLC**
3 World Trade Center
175 Greenwich Street
New York, NY 10007

**GROUPM WORLDWIDE LLC D/B/A WPP MEDIA**
3 World Trade Center
175 Greenwich Street
New York, NY 10007

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

RICHARD FOSTER,

         *Plaintiff*,

    v.

WPP, PLC and GROUPM WORLDWIDE LLC
D/B/A WPP MEDIA,

         *Defendants*.

Index No.:

**PLAINTIFF'S COMPLAINT
WITH JURY DEMAND**

---

Plaintiff Richard Foster ("Foster" or "Plaintiff"), by and through his undersigned counsel, brings this Complaint against GroupM Worldwide LLC d/b/a WPP Media ("GroupM" or "WPP Media") and WPP plc ("WPP" and, together with GroupM or WPP Media, the "Company" or "Defendants"). Plaintiff alleges the following upon personal knowledge as to his own actions and experiences, and upon information and belief as to all other matters:

## I.   <u>PRELIMINARY STATEMENT</u>

1.     WPP is a media giant that controls billions in client spending annually. Until 2024, WPP, via its GroupM division (recently rebranded to WPP Media), controlled approximately $60 billion dollars of client advertising spend. It was the largest media buyer in the world, with its market share ranging from 20% to 50% in geographic markets worldwide. Recently, however, well-publicized issues have sent GroupM and WPP into financial free fall.

2.     GroupM was launched to consolidate the media buying power of WPP clients, providing a competitive advantage to those clients by leveraging their combined spend to secure media price advantages, or volume-based discounts. These discounts may take the form of cash, free or discounted inventory, or other services provided at little or no cost, functioning as financial

3

rewards from media vendors to large buyers like GroupM based on the total volume of client advertising placed through them. The scale of this purchasing power enabled GroupM to leverage their client spend to force many ad-supported television and media platforms to give GroupM discounts, which, rather than being passed back to clients, GroupM turned into a non-disclosed profit center.

3. Over time, clients became aware – and critical – of these practices and for years, WPP has faced scrutiny from regulators and clients alleging misuse of client spending power to obtain undisclosed financial incentives such as rebates. Although WPP publicly touts a "client-first" ethos and claims "zero tolerance" for corrupt and unethical practices, in reality a significant share of its profits comes from leveraging client spend to extract rebates, media inventory, and other financial incentives that benefit WPP at the expense of the very clients whose funds make them possible. To protect this hidden profit stream, WPP punishes those who "speak up" and threaten the culture of client abuse and improper behavior of many senior executives.

4. Richard Foster spent seventeen years at GroupM rising to Global CEO of its content division. By 2025, Foster was managing approximately $500 million in annual GroupM investment into entertainment projects and leading one of WPP's most successful and high-profile divisions, which funded and co-produced approximately 200 television series each year and more than 2,500 series during his tenure. Over a period of eight years, Foster built his division to operate independently of the Defendants' improper inventory and rebate practices. Foster established a Global Commercial Operations Team to partner with local markets to vet and approve content investments to ensure deals were structured in compliance with contractual and regulatory obligations. In addition, Foster delivered presentations to executive leadership, characterizing rebate-driven deals as unsustainable, unlawful, and a significant threat to the Company. He

estimated that, over the past five years, GroupM generated rebate-driven deals valued between $3 and $4 billion, of which it improperly retained approximately $1.5 to $2 billion. Rather than address these issues, WPP executives cut Foster out of deals, marginalized him, and ultimately terminated him and his team to cover up their own improper practices.

5.      Richard Foster brings this action against WPP and WPP Media to expose the misconduct of those who orchestrated his and his team's termination and to hold them accountable under the law.

## II.  **PARTIES**

### A.  **Richard Foster**

6.      Plaintiff Richard Foster is a former executive of Defendant GroupM. Plaintiff resided and worked in California during the period in which he engaged in protected activity and was subjected to retaliation, including at the time of his termination. Foster currently resides in, and is a citizen of, the United Kingdom.

### B.  **WPP**

7.      Defendant WPP is a multinational advertising and communications conglomerate headquartered in London, England. At all relevant times, WPP conducted substantial and continuous business in the United States, including New York and California.

8.      Throughout Foster's employment, WPP exercised control over the terms and conditions of his employment. This control included, without limitation, authority over Foster's job responsibilities, compensation and promotion decisions, placement within GroupM, compliance expectations, and his termination. Foster was subject to WPP policies and executive decision-making, and he reported his concerns regarding illegal conduct of fellow executives directly to WPP leadership, confirming WPP's control over the matters at issue.

### C. WPP Media

9.      On May 28, 2025, WPP announced that "WPP Media" would replace GroupM as the official name of its global media-buying business.[1]

10.      GroupM Worldwide LLC is a Delaware limited liability company with its principal place of business in New York, New York. It is a wholly owned subsidiary of Defendant WPP. As WPP's media arm, GroupM oversees tens of billions of dollars in annual media spend for clients. It serves top advertisers such as Unilever, Coca Cola (excluding U.S.), Google, Ford, and Nestle. Through its Government & Public Sector Practice, it provides services to government organizations in more than 70 countries.[2] GroupM commands a dominant share of advertiser spending in key markets and media categories, placing it in a position from which it wields exceptional influence over how messages reach the public.

11.      At all relevant times, Plaintiff Richard Foster was employed by GroupM, now called WPP Media. GroupM was the entity responsible for managing GroupM Motion Entertainment (formerly Motion Content Group and GroupM Entertainment), the division Foster led as Global CEO.

12.      As alleged in this Complaint, GroupM was involved in the conduct giving rise to Foster's claims. Its executives played a direct role in the adverse employment actions taken against Foster.

---

[1] *See* WPP plc, Newsroom, *WPP Media launches as fully integrated, AI-powered media company* (May 28, 2025) (announcing that "WPP Media replaces GroupM as the name of WPP's global media company").
[2] *See* WPP, Government & Public Sector Practice (n.d.), https://www.wpp.com/en/companies/wpp-government--public-sector-practice.

Case 1:25-cv-10674-GHW    Document 1-1    Filed 12/23/25    Page 8 of 35



III. **RELEVANT NON-PARTIES[3]**

A. **Mark Patterson**

13.    Mark Patterson ("Patterson") currently serves as Global President of Markets and Business Operations for WPP Media, a position he assumed in January 2025. Previously, Patterson served as Global Chief Operating Officer of GroupM from November 2019 to January 2025, during which time Foster became his direct report. As COO, Patterson supervised GroupM Trading, the global media-buying arm of WPP that aggregates client advertising budgets and uses that scale to negotiate terms on inventory deals with media vendors.

14.    Under Patterson's leadership, GroupM Trading adopted policies and practices that prioritized securing rebates and financial incentives for GroupM, often at the expense of client value. In his reports to WPP's senior leadership in 2024, Foster directly implicated Patterson and

---

[3] All actions alleged herein against the individuals identified in this section were undertaken within the scope of their employment with Defendants WPP or WPP Media ("GroupM") and are attributable to those entities accordingly.

Case 1:25-cv-10674-GHW     Document 1-1     Filed 12/23/25     Page 9 of 35

the rebate practices Patterson condoned at GroupM Trading.

### B. Andrew Meaden

15.    Andrew Meaden ("Meaden") is the Global Chief Investment Officer at WPP Media and a longtime friend and colleague of Mark Patterson, who promoted him to the role. Patterson placed Meaden in charge of GroupM Trading, giving him direct authority over rebate, services, and inventory arrangements as well as client pricing practices. As the head of GroupM Trading, Meaden leveraged client spend in negotiations with media vendors to secure favorable pricing for clients while simultaneously structuring proprietary media deals for GroupM.

16.    In this role, Meaden instructed subordinates to structure transactions that drive rebates and other financial incentives toward GroupM, improperly prioritizing its profits over client interests. Meaden also set global investment policies and benchmarks that directed local markets to pursue arrangements most lucrative to GroupM, using client funds and buying power to enrich GroupM at clients' expense.

### C. Nicola McCormick

17.    Nicola McCormick ("McCormick") serves as General Counsel, Media at WPP. She held the role of General Counsel at GroupM from approximately November 2015 to August 2023.

18.    McCormick participated in multiple meetings with Foster concerning ongoing misconduct within WPP and GroupM. The meetings related explicitly to GroupM Trading's inventory and rebate practices.

### D. Andrea Harris

19.    Andrea Harris ("Harris") has been the General Counsel of WPP since 2005 and chairs its Risk Committee.

20.    Harris failed to investigate Foster's reports and took no meaningful corrective action.

### E. Mark Read

21.    Mark Read ("Read") has served as Chief Executive Officer of WPP since September 2018. He originally joined the company in 1989 and was appointed to WPP's Board of Directors in 2006. Read has publicly acknowledged the need for reform at WPP, emphasizing greater transparency across the organization. He retired from the Board and his position as CEO on September 1, 2025.

### F. Brian Lesser

22.    Brian Lesser ("Lesser") has served as Global Chief Executive Officer of GroupM since September 2024. He joined WPP in 2007 and previously held the role of CEO of GroupM North America from 2015 to 2017. Lesser left the Company in 2017, and returned in 2024 to assume his current position.

### G. Brian Gleason

23.    Brian Gleason ("Gleason") served as GroupM's Chief Commercial Officer from 2019 to 2022, during which time he oversaw the company's proprietary businesses, including Motion Content Group. Prior to Gleason's departure, Foster reported directly to him and raised concerns with him regarding GroupM Trading's rebate practices.

### H. Matthew Sweeney

24.    Matthew Sweeney ("Sweeney") served as Chief Investment Officer of GroupM U.S. from 2019 to January 2025, reporting directly to Meaden. Sweeney was responsible for the media investment strategy in the U.S. market and resisted pressure from Meaden to leverage client spend to grow proprietary media deals for GroupM. He left the Company in early 2025

9

following repeated efforts by Meaden to cause his removal.

### I. Carlos Catalán González

25.     Carlos Catalán González ("González") has served as the Global Chief Financial Officer of GroupM Investment since 2020. In this role, he is responsible for structuring and overseeing financial controls for proprietary media transactions executed through GroupM Trading.

### J. Tony Moulsdale

26.     Tony Moulsdale ("Moulsdale") served as a Managing Director at Motion Entertainment from 2010 to 2022. He joined WPP in 2007 and held key programming and content leadership roles at Mediacom, a GroupM agency, before joining Foster's team in 2010.

### IV.   JURISDICTION AND VENUE

27.     Defendant WPP is a multinational advertising and communications conglomerate that transacts substantial and continuous business within the State of New York, including through its wholly owned subsidiary, WPP Media. Defendant WPP Media maintains its principal place of business in New York County. Both parties regularly conduct business within New York and employ senior management, legal, compliance, and executive personnel responsible for decisions at the heart of this action.

28.     Defendants committed tortious acts within the State of New York, including but not limited to retaliatory adverse employment actions, compliance directives, and pretextual termination of Plaintiff (and others), all of which were planned, authorized, or ratified by leadership operating from New York County. Key decisions regarding Plaintiff's employment, including his termination, were directed or orchestrated by personnel based in New York.

29.     Plaintiff is a citizen of, and is domiciled in, the United Kingdom.

Case 1:25-cv-10674-GHW    Document 1-1    Filed 12/23/25    Page 12 of 35

30.     This Court has jurisdiction over this action pursuant to the Constitution and laws of the State of New York. The Supreme Court of the State of New York is a court of general jurisdiction competent to hear and determine all causes of action of the type asserted herein.

31.     Venue is proper in New York County pursuant to CPLR §§ 503 and 509 because Defendant WPP Media maintains its principal place of business in New York County, and because a substantial part of the acts and omissions giving rise to the claims occurred within this County.

32.     This Court has personal jurisdiction over Defendants WPP and WPP Media pursuant to CPLR §§ 301 and 302(a)(1)–(3). Defendant WPP Media maintains its principal place of business in New York County and continuously transacts business within this State. Defendant WPP, through its ownership and control of WPP Media, conducts substantial, continuous, and systematic business activities in New York. WPP derives significant revenue from its New York operations and purposely avails itself of the privilege of conducting business within the State.

33.     Accordingly, jurisdiction and venue are proper in the Supreme Court of the State of New York, County of New York.

## V.   <u>APPLICABLE LAW</u>

34.     Plaintiff Richard Foster resided in, and primarily worked from, California during the period in which he engaged in protected activity, including internal reporting of misconduct and the period leading up to his retaliatory termination on July 10, 2025.

35.     Plaintiff's employment relationship with Defendant was governed by a written employment agreement, which contains the following California choice-of-law provision:

> "This Agreement will be governed by and construed in accordance with the laws of the State of California without giving effect to any choice or conflict of law provision or rule (whether in the State of California or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of California."

11

36.     Pursuant to this contractual provision and consistent with California Labor Code §
925, California law governs all claims arising from Plaintiff's employment relationship with
Defendants.

37.     In addition, and without waiving the protections of California law, Plaintiff asserts
claims under New York law because unlawful conduct occurred in New York, was directed from
New York-based operations, or was ratified by senior executives operating out of Defendants' New
York headquarters or offices. These include, but are not limited to, decisions regarding Plaintiff's
employment, termination, pretextual internal directives, and the suppression of whistleblower
activity.

## VI.     FACTUAL BACKGROUND

### A.  Foster Emerges to Leadership by Promoting Growth and Integrity

#### i.     *Foster's Rise in Global Media Entertainment*

38.     Before his termination, Plaintiff Richard Foster was regarded as a seasoned
executive and was widely respected for his leadership in the global media and entertainment
division of GroupM. Foster joined GroupM in 2008 as the Commercial Director of GroupM
Entertainment UK. Within a year, he was promoted to Managing Director of GroupM
Entertainment UK and simultaneously appointed Director of Strategy & Distribution for GroupM
Entertainment Worldwide. Earning a reputation for "principled leadership," strategic vision, and
the ability to build high-performing teams, Foster was promoted to Global Chief Executive Officer
of GroupM Entertainment in February 2015.

39.     As Foster rose into senior leadership positions, WPP and other global media buying
firms came under fire as a result of allegations of kickbacks and other practices which abused the
trust of their clients. For its part, WPP presented public claims of transparency and ethical

12

principles through its codes of conduct and internal compliance policies. The WPP *Code of Business Conduct* portrayed a company-wide pledge to act "ethically in all aspects of our business" and maintain "the highest standards of honesty and integrity." WPP's *Business Integrity: Anti Bribery & Corruption* booklet ("ABC Booklet") outlines the company's obligations under global anti-bribery and anti-corruption laws. The misuse of rebates is prohibited in the ABC Booklet, and accurate accounting is mandated.

## 3.7 ABUSE OR MISUSE OF REBATES

There is a risk of abuse or misuse of rebates. Rebates should either be transferred to the client if the contract or local law requires it or retained by the agency or a media broker. If rebates are not accounted for properly, they could be used to fund bribery or pay third party consultancy or research fees that in turn are used to pay bribes.

40.     Furthermore, WPP's Anti-Fraud, Bribery, & Corruption Policy ("AFBAC Policy") prohibits fraud in all forms including false accounting, improper revenue recognition, and misstatements of company accounts. The Policy requires that any suspected or actual instances of fraud, bribery, or corruption be reported promptly to WPP Legal or WPP Business Integrity and affirms WPP's zero-tolerance policy for retaliation against anyone who raises such concerns in good faith. Although framed as internal commitments, these policies are grounded in binding obligations under the Sarbanes–Oxley Act, which mandates accurate financial reporting, effective internal controls, and protection of employees who disclose fraud.[4] Of course, the "policies" align

---

[4] *See* Sarbanes–Oxley Act of 2002, Pub. L. No. 107-204, §§ 302, 404, 806, 116 Stat. 745, 777, 789, 802 (codified at 15 U.S.C. §§ 7241, 7262; 18 U.S.C. § 1514A).

13

with WPP's contractual obligations, which require that client budgets be used solely for authorized client media purchases and that any non-cash benefits derived from a client's spend be fully disclosed and passed through to the client. Unfortunately, the policies were too often "honored only by their breach."

### ii.    Foster's Push for Reform

41.    In the global advertising and media-buying industry, kickbacks[5] (euphemistically referred to as "agency volume bonuses" or rebates) are financial incentives paid by media vendors to agencies based on the total volume of advertising spend. These incentives take the form of cash, free or discounted inventory, or other services provided at little or no cost, and function as rewards for steering substantial client spend to particular vendors. In practice, such incentives enable agencies to generate revenue beyond the fees charged directly to clients.

42.    Fiduciary obligations require that such practices be fully disclosed to the client or passed through in full. However, WPP and GroupM had long relied on "rebates" as a hidden profit center, relying on complex deal structures, undisclosed side arrangements, and opaque financial reporting to divert these incentives for their own benefit. Although rebate practices erode client trust and raise serious regulatory and contractual compliance concerns, they were deeply entrenched in the practices of many business units at WPP.

43.    Concerns over rebate practices peaked in late 2015, when the Association of National Advertisers ("ANA") commissioned K2 Intelligence to conduct an independent investigation into transparency in the U.S. media-buying ecosystem.

44.    Amid increasing scrutiny over media-buying transparency, Foster proposed rebranding and relaunching his division, GroupM Entertainment, as a separate entity within

---

[5] A kickback is a form of bribery where a payment is made to someone in a position of power (or influence) to induce them to give preferential treatments to the person making the payment.

GroupM. Central to his reasoning was to separate his division from GroupM Trading, the media investment arm of GroupM responsible for negotiating deals with vendors and known for leveraging client funds to secure "rebate-driven" deals. Under Foster's plan, the new division would operate as a standalone entity investing in entertainment partnerships with GroupM's own capital instead of client funds, which would allow Foster to shield GroupM and his division from the controversial kickback practices occurring within GroupM Trading and avoid conflicts of interest.

45. At GroupM Entertainment Global Day in the summer of 2015, Foster presented his vision to internal stakeholders. This presentation laid the foundation for what would eventually become Motion Content Group, a division built on openness, creative independence, and ethical governance.

46. Although Foster's presentation was enthusiastically greeted within GroupM Entertainment, it was not embraced by senior executives at GroupM Trading. On March 16, 2016, Foster met with the new GroupM Global CEO Dominic Proctor ("Proctor") (and COO Colin Barlow) to again propose creating Motion Content Group as a fully independent entity. Foster warned that under the current operating structure, there was a significant risk to the entire GroupM organization as GroupM Trading treated GroupM Entertainment as a vehicle to conceal its rebate problems. He expressly informed Proctor that GroupM Trading's existing practices were not designed to resolve the root issues, but to delay reform and protect short-term profitability.

47. Shortly thereafter, on June 7, 2016, the ANA/K2 Intelligence Report was released, validating Foster's concerns. The investigation into the U.S. media-buying ecosystem uncovered "pervasive" non-transparent business practices, including undisclosed kickbacks, and inventory

15

Case 1:25-cv-10674-GHW    Document 1-1    Filed 12/23/25    Page 17 of 35

arbitrage schemes orchestrated by major media agencies and holding companies. As the largest media holding company in the world, WPP was repeatedly tied to the report's conclusions.

48.     To Foster, WPP's public attempts to downplay the report's findings rang hollow, as he knew firsthand that the core issues identified in the investigation persisted within WPP at GroupM Trading.

49.     Particularly concerning were comments from Mark Patterson, then-Global CEO of GroupM Asia Pacific and later identified by Foster as a central figure behind "rebate-driven" deals. In a November 2016 interview, Patterson remarked that "rebate is not a dirty word," framing the issue as merely a matter of "open dialogue and discussion." His remarks not only downplayed the seriousness of the allegations but also foreshadowed his unwillingness to reform the controversial rebate practices that placed the Company at risk.

50.     Despite the absence of accountability from WPP's leadership, the mounting public and regulatory scrutiny underscored the importance of Foster's advocacy for change. On May 17, 2017, Motion Content Group was officially launched with Foster as Global CEO. GroupM announced the launch with the express purpose of Motion Content was for GroupM to "invest its own funds into…deals." In Foster's own words, "our objective is to help create and support editorially and commercially vibrant premium content for the benefit of our content partners and advertisers. We will achieve this by continuing to invest into the content industry and lead the development of new models, commercial content structures and partnerships with media networks, platforms, talent, producers, and distributors."[6]

51.     Following the launch, Foster presented Motion's vision to senior executives across GroupM's global operations, framing the Motion model as a solution to rising client expectations,

---

[6] Press Release, PR Newswire, GroupM Launches Motion Content Group, a New Global Content Investment and Rights Management Group (May 15, 2017).

increased regulatory scrutiny, and evolving market pressures.

52.     On September 3, 2018, Mark Read was appointed as CEO of WPP. Not long afterwards, it was announced that the FBI launched a criminal probe into the very kickback practices detailed in the ANA/K2 Intelligence Report.

53.     In his first annual shareholder letter dated April 10, 2019, Read acknowledged that "2018 was in many ways a turbulent and difficult year for WPP," but also characterized it as "a year of renewal and much-needed change."[7] Read unveiled a sweeping three-year "radical evolution" plan emphasizing a pivot toward U.S. leadership of creative content, organizational simplification, and a culture grounded in "openness, optimism, and a commitment to extraordinary work."[8]

54.     Against this backdrop, Foster expanded Motion Content Group, proving within the Company that financial success could be achieved without compromising integrity.

### iii.     Motion Content Group Grows Under Foster While WPP and GroupM Falter

55.     Under Foster's leadership, Motion Content Group became a leading content producer. The division co-produced and co-financed more than 2,500 series worldwide, including *Love Island* and the award-winning documentary *Group Therapy*. Foster also spearheaded high-profile collaborations with global talent like Leonardo DiCaprio, LeBron James, and Kevin Hart.

56.     Motion quickly became one of GroupM's most profitable divisions, managing approximately $500 million of GroupM investment into entertainment partnerships and earning widespread recognition for its innovation, performance, and creative leadership. In 2018, Foster

---

[7] *See Chief Executive's Statement*, WPP Annual Report 2018, https://www.wpp.com/en/-/media/project/wpp/images/annual-report-2018/wpp-annual-report-2018-chief-executive-statement.pdf.

[8] In 2021, WPP even adopted a new Data and AI Ethics Hub, which included the launch of a WPP Ethics Guidelines Tool that provided guidance to ensure WPP's work aligns with key principles of transparency, fairness, respect, and accountability across the organization.

personally relocated from London to Los Angeles to develop Motion's North American presence where he built strategic partnerships with networks, platforms, and creative partners. By 2019, Motion had achieved a 213% increase in net sales in five years.

### iv.  *Mark Patterson Assumes Role of COO and Takes Charge of GroupM Trading*

57.    On November 15, 2019, Mark Patterson was promoted to Global Chief Operating Officer of GroupM. Shortly after this promotion, Patterson appointed his longtime friend, Andrew Meaden, as GroupM's Chief Investment Officer, responsible for overseeing GroupM Trading. Together, Patterson and Meaden assumed direct control over GroupM Trading, managing billions in client funds which should have been used to secure advertising from vendors for GroupM's clients.

58.    Around this same time, Foster gave a presentation to his boss Brian Gleason ("Gleason"), the Global Chief Commercial Officer at GroupM. Foster apprised Gleason of the ongoing "risks" to GroupM from "deals" not being appropriately structured. Foster specifically warned that GroupM Trading was structuring rebate-driven inventory deals that enabled GroupM to retain economic value that should have been returned to clients, thereby artificially inflating the Company's reported financial performance.

59.    In an effort to gloss over the truth, rebate-driven deals began to be referred to as "Classic Inventory" or "Purchase Risk" media deals. In these arrangements, GroupM Trading allegedly purchased large blocks of advertising inventory from vendors upfront "at GroupM risk." In truth, there was no risk because the scale and profitability of the deals were tied directly to client spending, which GroupM aggregated to hit vendor volume thresholds that triggered rebates that often came in the form of free or discounted inventory. By definition, these transactions were kickbacks because they were funded by leveraging client budgets and, as such,

18

Case 1:25-cv-10674-GHW    Document 1-1    Filed 12/23/25    Page 20 of 35

were required to be returned under client contracts and the common law. Rather than remit these benefits to its clients, GroupM reclassified the inventory as "proprietary media" and sold it back to clients through "opt-in" agreements. Particularly troubling to Foster was that many of GroupM's largest clients did not opt-in, yet their spend was still used to secure these volume-based rebates. Instead of pro-rating or crediting those benefits to the clients whose spend made the rebates attainable, GroupM pocketed the spread for itself and recorded it as "non-product related income." These practices not only breached contractual and fiduciary duties to clients, but they also misled investors as to the source and quality of earnings.

60.     After Foster's presentation, Gleason agreed that moving forward these deals would need to be more robust, deliver clear client benefits, and be structured in compliance with client contracts and regulatory requirements.

61.     Under Meaden's direction and Patterson's supervision, GroupM Trading continued the global initiative to prioritize the expansion of Purchase Risk media deals. Vendors were pressured to provide inventory in exchange for channeled client spend, and "extraction rates" were introduced to measure how much proprietary media GroupM secured from a vendor relative to client spend. These metrics, together with net sales growth targets derived from such deals, became performance benchmarks for local Chief Investment Officers, directly affecting their bonuses and, in some cases, their continued employment.

62.     In 2022, Gleason left the Company, and as a result, Foster began reporting directly to Patterson, placing him under the authority of an executive who was the subject of his concerns.

63.     Over the next year, Foster's concerns grew as GroupM Trading continued to rely on rebate practices despite the Company's "position" that undisclosed profits derived from client spend were prohibited. By contrast, Motion, under Foster's leadership, used GroupM's media-

buying leverage to generate profits through content and co-investment deals with clients and vendors in which costs, risks, and returns were more openly shared. This approach showed that the Company could achieve strong commercial results without hidden rebates or side arrangements. Motion's success, however, directly threatened the rebate-driven profit center of GroupM Trading. As a result, Foster was placed squarely in the crosshairs of both Patterson and Meaden, who were unwilling to convert deals to the Motion model and instead continued to rely on Purchase Risk deals to meet financial targets.

*v.    The Scandals Continue, and Reformation Efforts Falter*

64.    By 2023, Foster's concerns deepened as he observed Patterson and Meaden continuing to structure deals using the same non-transparent rebate practices that he had been warning the Company about since 2017. In one instance, Foster attended a meeting in New York led by Meaden, where the agenda was to determine how GroupM would leverage client budgets to secure inventory deals with U.S. vendors, rewarding vendors who did proprietary deals with GroupM and penalizing those that did not. As one example, Meaden specifically proposed diverting client funds away from Meta because Meta refused to do a proprietary media deal with GroupM. Foster openly objected to Meaden, advocating for an approach that did not involve coercing vendors or redirecting client budgets away from their preferred platforms. Other senior executives present, including Matthew Sweeney ("Sweeney"), agreed that Foster's proposal better served client interests and developed mutually beneficial relationships with critical vendors. Shortly after the meeting, however, Meaden removed Foster from the workstream.

65.    Around this same time, Meaden instructed his global trading team not to convert any trading deals to the Motion model. To Foster, it had become clear that the very problems that had subjected WPP to years of public and regulatory scrutiny not only remained unsolved but had

20

grown in scale under Patterson and Meaden's leadership, despite concerns raised by GroupM's own Finance and Legal executives, including Nicola McCormick ("McCormick") and Carlos Catalán González ("González").

66.     On October 23, 2023, Chinese authorities raided GroupM's China offices and then launched a sweeping anti-corruption investigation. The probe resulted in the detention of more than 30 employees, including senior GroupM executives, after whistleblower reports revealed that rebates intended for clients were being systematically retained and funneled through undisclosed channels.[9] This scandal damaged WPP's client relationships worldwide and heightened its exposure to legal and regulatory consequences. In the wake of this scandal, McCormick, González, Meaden, and Patterson were sent to "improve" the investment governance in local markets.

67.     These events reinforced Foster's opinion that the practices surrounding rebates within WPP and GroupM would – if not corrected – doom the entire enterprise. For Foster, GroupM Trading's conduct put both WPP and GroupM at substantial legal risk and raised serious ethical concerns.

**B.   Foster Escalates His Concerns**

*i.   Foster Reports His Concerns to GroupM General Counsel Nicola McCormick*

68.     In the wake of the China scandal, Foster took his concerns to McCormick, with whom he had a close working relationship with over the years and spoke to frequently about the need to improve GroupM trading practices involving inventory deals and related rebates. Following the China scandal, Foster again raised his concerns to McCormick during a series of calls and text messages. He warned that GroupM's rebate-driven deal structures were unlawful, created regulatory risk, undermined client trust, and were a significant risk to WPP.

---

[9] *See* Eduardo Baptista, *WPP Fires Executive Detained on Bribery Charges in China*, Reuters (Oct. 23, 2023), https://www.reuters.com/business/media-telecom/wpp-fires-executive-detained-bribery-charges-china-2023-10-23/.

Case 1:25-cv-10674-GHW    Document 1-1    Filed 12/23/25    Page 23 of 35

69.     In these communications with McCormick, Foster explicitly expressed his belief that voicing his concerns could subject him to personal retaliation, particularly given that he directly reported to Patterson, among the executives he believed responsible for the misconduct.

70.     Importantly, Foster described compliance measures implemented within his division, including a deal approval system with oversight by a dedicated Global Commercial Operations Team, and urged its adoption across the Company.

71.     Despite receiving Foster's reports and having the authority to investigate, McCormick did not, to Foster's knowledge, initiate any formal review or inquiry. Although she escalated the matter to WPP General Counsel Andrea Harris, no action was taken, and Foster's concerns were disregarded.

72.     Foster reiterated to McCormick that only emphatic leadership could implement the structural reform necessary to protect WPP and GroupM from reputational and legal fallout from this systemic problem. Foster told McCormick that WPP and GroupM have "been sleepwalking to the edge of a cliff and people don't want to hear it." In response, McCormick confirmed her view that "leadership REALLY matters" and encouraged Foster to "keep on it" and "hang in there," expressing her belief that Motion Content Group, under his direction, represented a "turning point." When asked directly about the risk posed by GroupM Trading's rebate practices, McCormick characterized it as "existential."

### ii.   WPP CEO Mark Read Expresses Support for Foster but Issues a Warning

73.     In June 2024, following a meeting in London with WPP CEO Mark Read ("Read") and Endeavor CEO Ari Emanuel, Read told Foster that he was concerned about GroupM, especially in the North America region. Read further disclosed to Foster that he wanted to create a new "WPP Entertainment" division under Foster's leadership but warned that certain individuals within GroupM were "jealous" of Foster and were "holding him back." Foster

understood these individuals to be Patterson and Meaden.

74.    About a month later, on July 17, 2024, WPP announced that Brian Lesser would become the new Global CEO of GroupM. Read told Foster his desire to align with Lesser on the launch of this new entertainment division and directed Foster to meet with Lesser to discuss its development.

### iii. *Foster Meets with GroupM CEO Brian Lesser and Prepares a 35-Page Report*

75.    In October 2024, Global CEO of GroupM, Brian Lesser, requested a meeting with Foster in New York. Having known Foster from his prior tenure at the Company, Lesser asked for a candid assessment of GroupM's operations, including any material issues or concerns of which Foster was aware.

76.    During this meeting, Foster described Motion's accomplishments. He also shared his concerns with GroupM Trading's lack of reform and ongoing reliance on rebates and other undisclosed profit schemes under Patterson and Meaden's leadership. Lesser acknowledged that he was aware of these issues and conceded that GroupM Trading failed to institute substantive change, which he attributed in part to the longstanding, relationship between Patterson and Meaden.

77.    After the meeting, Lesser asked Foster to prepare a written report detailing the issues he had raised and his recommendations for developing the new entertainment division. Believing this request was made in good faith, Foster began preparing the report in earnest, relying on Lesser's representations. In drafting the report, Foster confidentially consulted several senior executives across GroupM and even shared the section addressing rebate practices with McCormick prior to sending the final report to Lesser.

78.    On December 12, 2024, Foster submitted a 35-page report to Lesser. In the report,

Case 1:25-cv-10674-GHW    Document 1-1    Filed 12/23/25    Page 25 of 35

Foster emphasized the substantial opportunity in establishing a new entertainment division that could build upon the success he and his team had achieved with Motion. At the same time, Foster warned of the risks posed by GroupM Trading's continued reliance on Purchase Risk media deals. Foster emphasized that many of the largest clients in the industry are averse to Purchase Risk media deals as they are often seen as another form of rebates, and he warned of the possible legal and reputational risk these deals posed to WPP.

79.     Foster noted that GroupM was slow to innovate in its trading-related products and vendor partnerships, relying instead on Purchase Risk media deals (rebates) to generate "discounts." He observed that a substantial share of GroupM's largest clients were declining to participate in such deals, reflecting a perception that GroupM leveraged vendor arrangements primarily for its own net sales benefit rather than for client advantage. Foster also reported that GroupM continued to derive nearly $1 billion in global net sales from non-product-related income, including rebates, services, and Purchase Risk trading inventory.

80.     Foster went on to explain how the media landscape had evolved toward a mix of subscription and ad-supported platforms and argued that entertainment should be a strategic priority for GroupM and WPP. He emphasized that a new entertainment division could leverage the Motion model as its foundation, delivering value to clients and media partners. Foster contrasted this approach with the existing trading practices, instead proposing WPP Legal approved, mutually beneficial entertainment partnerships with platforms and vendors to ensure client benefit. He noted that such arrangements could be supported by Motion's Global Commercial Operations Team to ensure deals were properly assessed and managed. Foster further stressed that this type of business would be especially attractive to GroupM's largest clients, many of whom had rejected Purchase Risk media deals.

81.     After receiving no acknowledgment, Foster texted Lesser to request a meeting to discuss the report. On January 17, 2025, Lesser called Foster to discuss the report and expressed concern about the legal risks tied to GroupM Trading and said he would investigate this further. Then, on January 21, 2025, Lesser texted Foster, asking him to send a "sanitized" version of the report to Patterson and to exclude "any overt criticism of [GroupM] trading as that is not in the spirit of working together." Lesser understood that any such criticism would be a direct indictment of Patterson and Meaden, who were responsible for leading GroupM Trading. Lesser further asked Foster to collaborate with Patterson on the new entertainment division.

82.     Foster agreed to revise the report and prepare a "sanitized" version for Patterson. On January 21, 2025, Foster joined a scheduled call with Patterson, after which he planned to send the "sanitized" report. During the call, however, Patterson informed Foster that Lesser had already forwarded him the original, unedited version, which contained Foster's explicit concerns about the rebate practices within GroupM Trading under Patterson's leadership. When Foster asked Patterson about collaborating on the plan for the new entertainment division, Patterson curtly replied that he had "all he needed" from Foster.

83.      Just hours later, Lesser blindsided Foster by announcing that the sports and entertainment media divisions would now report directly to Patterson. The announcement came as a shock to Foster given his earlier discussions with Read and Lesser and Patterson's oversight of the rebate practices within GroupM Trading. Foster texted Lesser that colleagues were asking if he had "left the business with Patterson now leading [entertainment] for GroupM." Lesser did not respond.

84.     The next day, WPP announced the elimination of Global CEO roles for three agency brands as part of a centralization plan. Patterson was repositioned to Global President

Case 1:25-cv-10674-GHW    Document 1-1    Filed 12/23/25    Page 27 of 35

with oversight of the APAC and LATAM regions and the entertainment and sports divisions.

85.    Additionally, Patterson, whom Foster identified as a central figure in WPP and GroupM's rebate practices, was appointed to oversee investment governance, a decision that McCormick herself remarked was "not the most obvious fit" for the role.

86.    Foster then realized that senior leadership had no genuine intention of addressing the rebate practices or enacting meaningful reform.

C.    **WPP and GroupM Retaliate Against Foster and Terminate his Employment**

87.    Immediately after taking on his new role, Patterson began excluding Foster from meetings and strategic initiatives, cutting him out of deals, and isolating him from decision-making.

88.    On January 21, 2025, Foster texted Nicola McCormick that Patterson and Meaden had excluded him from a major content deal, describing the situation as "looking unfortunate."

89.    Over the ensuing weeks, it became obvious to the members of his team, and even outsiders that Patterson was determined to be "rid of Foster."

90.    On February 27, 2025, WPP publicly circulated a press release with its 2024 fiscal year results and preliminary projections for fiscal year 2025. During the investor presentation, Lesser set out his strategic priorities for GroupM which included "introducing new proprietary trading models" that would leverage GroupM's "scale" to "redefine industry standards." Read further emphasized the "urgency" to deliver these trading models. In the question-and-answer segment, Lesser was asked what had been "wrong" with GroupM in the past, to which Lesser replied "there was nothing wrong in the past," adding that GroupM was "relentlessly focused on our clients." However, these statements concealed the nature of GroupM's trading operations, which, as Foster warned Lesser, had become increasingly reliant on deeply entrenched rebate-

Case 1:25-cv-10674-GHW    Document 1-1    Filed 12/23/25    Page 28 of 35

driven deal structures that diverted value from clients and exposed the company to significant legal and reputational risk. As he acknowledged to Foster, Lesser knew these issues persisted and admitted that GroupM Trading had not meaningfully reformed during the eight years since Lesser's 2017 departure.

91.     On March 3, 2025, Foster wrote to McCormick, "I've been squeezed out ever since I reported to [Patterson]," and expressed his view that Patterson would cause his termination. He expressed frustration over the lack of support from Patterson and Meaden, noting his division had been GroupM's fastest-growing the prior year, with a 140% increase in the U.S. market alone.

92.     Then on or about April 17, 2025, a representative for GroupM arranging a key client meeting with officials from Saudi Arabia specifically requested the attendance of the "Motion CEO," i.e., Foster. Despite this direct request, Patterson removed him from the meeting.

93.     That same day, Foster texted McCormick that he "feels like [I am] being squeezed out," and that it won't be long before the shoe drops.

94.     Foster's words were prophetic – on May 29, 2025, WPP announced that its media business "GroupM" would be rebranded as WPP Media as part of a broader restructuring. While WPP characterized this as part of an integration initiative, it was a pretextual cover for Defendant's decision to terminate him and his team in retaliation for their repeated objections to GroupM's rebate-driven trading practices.

95.     On July 9, 2025, WPP publicly released a "First-Half 2025 Trading Update" – a report that attempted to blunt the impact of WPP's poor financial condition by understating it. Although the company admitted that it had "seen a deterioration in performance as Q2 progressed" and that "severance action at WPP Media" would cause a material margin decline,

27

WPP misleadingly blamed the shortfall on "continued macro uncertainty," "weaker net new business than anticipated," and "some distraction to the business as a result of the restructuring of WPP Media." The market reacted immediately: WPP's share price fell roughly 18 percent in a single day, from $35.82 on July 8, 2025, to $29.34 on July 9, 2025, erasing over a billion in market value. It also significantly understated the problem.

96.     This public disclosure squarely implicated WPP Media, the division that Foster repeatedly warned was engaging in unsustainable, misleading, and unethical practices. The same executives who received his internal reports were now publicly attributing WPP's "forecast adjustments" in earnings to problems inside the very business about which Foster presented a detailed explanation as he explained the need for changes. And, obviously designed to scapegoat Foster, the Company terminated Foster "without cause" the day after announcement.

97.     At no point did WPP or WPP Media conduct a formal review or investigation into Foster's reports, as required under their compliance policies and applicable whistleblower protection laws, nor was corrective action ever taken.

98.     On October 30, 2025, newly appointed CEO Cindy Rose ("Rose") released WPP's "Third-Quarter Trading Update," reporting an 8.4 percent year-over-year decline in revenue driven by a "step-down" in WPP Media. Rose publicly conceded that WPP Media had "lost its way," emphasizing that "turning WPP Media around is absolutely critical." WPP's share price fell as much as 18 percent intraday, hitting a 27-year low. Calling the performance "unacceptable," Rose announced that the Board had initiated a strategic review.

99.     These disclosures pinpoint WPP Media, the division at the center of Foster's concerns, as the locus of WPP's underperformance and echo Foster's warnings that WPP Media's persistent reliance on rebate-driven deals posed an "existential" threat to the company. Instead of

heeding these warnings, WPP chose to protect its own profits, whitewashing the problem and terminating the very executive who advocated for change. Consequently, the harm is no longer speculative and WPP must now reckon with the fallout.

100.    Notably, since his termination on July 10, 2025, multiple U.S. law firms have announced shareholder investigations into WPP for securities fraud violations.[10] In addition, a putative federal securities class action has been filed in the Southern District of New York alleging that WPP and senior executives misled investors regarding the performance of WPP Media and names Brian Lesser – the executive who met with Foster about the division's lack of reform – as a defendant responsible for material misstatements and omissions. [11]

## VII.  CAUSES OF ACTION

## Count One: Retaliation in Violation of California Labor Code § 1102.5

101.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

102.    California Labor Code § 1102.5 prohibits an employer from retaliating against an employee for disclosing information, or refusing to participate in activity, that the employee reasonably believes violates state or federal law, or a local, state, or federal rule or regulation.

103.    At all relevant times, Plaintiff Richard Foster was an employee of Defendants.

104.    During his employment, Foster discovered and reported systemic misconduct related to Defendants' rebate practices, including, but not limited to, the unlawful retention and concealment of client rebates, the mischaracterization of rebate-related revenue, and the failure

---

[10] *See* Press Release, Levi & Korsinsky LLP, *Levi & Korsinsky Investigates WPP plc (WPP) Over Possible Securities Fraud* (July 19, 2025); Press Release, The Schall Law Firm, *WPP Investors Have Opportunity to Join WPP plc Fraud Investigation with the Schall Law Firm* (July 19, 2025); Press Release, Pomerantz LLP, *Investigation into WPP plc Sparks Investor Concerns Over Practice*s (July 23, 2025).
[11] *See* Marty v. WPP plc, No. 1:25-cv-08365 (S.D.N.Y. filed Oct. 9, 2025).

to disclose such conduct to clients, regulators, internal compliance authorities, and financial reporting stakeholders.

105.    Foster reasonably believed that this conduct violated multiple state and federal laws, including, but not limited to, consumer protection statutes under the California Business and Professions Code and California Civil Code, fiduciary duties, corporate disclosure obligations, including SEC regulations, and internal compliance policies and procedures.

106.    Foster reported these concerns to high-ranking executives and legal counsel within WPP and WPP Media.

107.    Rather than investigating or addressing misconduct, Defendants retaliated against Foster by marginalizing his authority, dismantling his team, withholding compensation, and ultimately terminating his employment on July 10, 2025.

108.    As a direct and proximate result of Defendants' unlawful retaliation, Foster has suffered and continues to suffer significant economic loss, reputational harm, emotional distress, and other damages.

109.    Pursuant to California Labor Code §§ 1102.5 and 1102.6, Plaintiff is entitled to all available relief, including compensatory damages, civil penalties, equitable remedies, attorneys' fees and costs, and any other relief as provided by law.

**Count Two: Wrongful Termination in Violation of Public Policy**

110.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

111.    California law prohibits an employer from terminating an employee in violation of fundamental public policy, including for reporting or refusing to engage in unlawful conduct. Such policies are reflected in statutes and constitutional provisions that protect whistleblowers,

30

prohibit fraud, and require fair and ethical business practices, including those set forth in California Labor Code § 1102.5 and laws governing consumer protection, fiduciary duties, and financial reporting.

112.    Foster engaged in protected activity by reporting what he reasonably believed to be unlawful and unethical practices related to Defendants' rebate and revenue recognition schemes, and by refusing to participate in those practices.

113.    Defendants' decision to terminate Foster on July 10, 2025, was substantially motivated by his engagement in this protected activity.

114.    Foster's termination was wrongful and in direct violation of the fundamental public policy of the State of California, including but not limited to policies promoting ethical corporate conduct, fiduciary transparency, and whistleblower protection.

115.    As a direct and proximate result of Defendants' conduct, Foster has suffered and continues to suffer lost compensation, lost equity, diminished career opportunities, emotional distress, and reputational harm.

116.    Defendants' conduct was intentional, malicious, oppressive, and carried out with a willful disregard of Foster's legal rights, entitling him to punitive damages.

**Count Three: Retaliation in Violation of New York Labor Law § 740 (Pled in the Alternative)**

117.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein and pleads this cause of action in the alternative to his claims under California law.

118.    At all relevant times, Defendants were employers, and Plaintiff was an employee within the meaning of New York Labor Law § 740.

119.    Plaintiff engaged in protected activity under NYLL § 740 by disclosing and objecting to conduct he reasonably believed violated one or more laws, rules, or regulations,

Case 1:25-cv-10674-GHW   Document 1-1   Filed 12/23/25   Page 33 of 35

and/or posed a substantial and specific danger to public health and safety. Specifically, Plaintiff reported that Defendant unlawfully retained and concealed client rebates, misrepresented revenue derived from those rebates, and failed to disclose such conduct to clients, regulators, internal compliance personnel, and financial oversight authorities.

120.    Plaintiff made these disclosures in good faith to senior executives and legal counsel within the Company and refused to participate in the unlawful conduct.

121.    Defendant's actions were taken because of Plaintiff's protected activity and constitute unlawful retaliation in violation of New York Labor Law § 740.

122.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer lost income, loss of equity and other earned compensation, reputational harm, emotional distress, and other compensable damages.

123.    Pursuant to NYLL § 740, Plaintiff is entitled to all available relief, including front pay, back pay, compensatory damages, civil penalties, injunctive relief, and attorneys' fees and costs.

## VIII.  <u>DEMAND FOR JURY TRIAL</u>

124.    Plaintiff hereby demands a trial by jury on all issues of fact to which he is entitled to a jury trial in this action.

## IX.  **PRAYER**

125.    WHEREFORE, Plaintiff Richard Foster respectfully requests that the Court enter judgment in his favor and against Defendants, and award damages of not less than $100 million, including but not limited to:

a.  Declaratory relief finding that Defendants violated Plaintiff's statutory and common law rights by retaliating against him for engaging in protected activity and by wrongfully terminating his employment in violation of public policy;

b.  Compensatory damages, including but not limited to emotional distress, reputational harm, and loss of past and future earnings, in an amount to be determined at trial;

c.  Equitable relief, including front pay and back pay, and recovery of all wages, bonuses, equity compensation, and benefits to which Plaintiff would have been entitled but for Defendants' unlawful conduct;

d.  Punitive damages in an amount not less than $100 million to punish and deter Defendants' willful and malicious misconduct, to be determined at trial;

e.  Statutory and civil penalties, including those authorized by California Labor Code § 1102.5 and other applicable provisions of law;

f.  Reasonable attorneys' fees and costs incurred in connection with this action;

g.  Costs and disbursements of this action;

h.  Pre-judgment and post-judgment interest on all amounts awarded, as permitted by law; and

i.  Such other and further relief as the Court deems just and proper.

Dated: November 11, 2025
       New York, New York

               Respectfully submitted,

               */s/ William A. Brewer III*

               **BREWER, ATTORNEYS & COUNSELORS**
               William A. Brewer III
               William A. Brewer IV
               750 Lexington Avenue, 14th Floor
               New York, New York 10022
               Telephone: 212.527.3024
               wab@brewerattorneys.com
               wbb@brewerattorneys.com

               **ATTORNEYS FOR PLAINTIFF RICHARD FOSTER**